I'm Ron Zumbrun of the Zumbrun Law Firm in Sacramento. I'm representing the plaintiffs, the Glenbrook Preservation Association, the Glenbrook, excuse me, the Huntington Glenbrook Trust, Claudia and Claire Huntington, trustees. Scott Fink, Mr. Scott Fink of Gibson, Dunn & Crutcher is also here representing the Huntingtons. Mr. Gunderson, who represents the Glenbrook Homeowners Association, and I have agreed to divide our time up with 10 minutes apiece. Mr. Gunderson will be dealing with the issues relating to the meadows in the Hamlet area and the Pier area and the property rights and easement rights that are involved. This is a case where all plaintiffs have been denied any discovery. Everything started in July of 26, the year 2000, when the Glenbrook Preservation Association wrote to the Tahoe Regional Planning Agency pointing out to them that they were conducting their affairs erratically, that they were giving preferential treatment to important, influential people. They were not enforcing their environmental regulations. They were not complying with their compact and gave specific examples to them where the problems appeared to be present. When no response was received in July 26 of that year, Glenbrook Preservation Association filed suit, including pursuant to TRPA Compact Article 6J1 and 3, which allows individuals to file suits to challenge the Tahoe Regional Planning Agency's failure to comply with their compact or with their regulations. In that suit, this is a special jurisdictional requirement? Yes, that section is. It provides that any individual can bring this type of suit. You have the Glenbrook Association. I just wonder, do they have standing to bring these? Yes, the Glenbrook Preservation Association is a nonprofit tax-exempt 501c3 organization whose goals include the protection and enhancement of Lake Tahoe. They brought the suit. There has been no challenge to their standing and no issue regarding their standing, and they have participated at all stages in this lawsuit and in the proceeding. I agree. It's just we like to know, you know, does everybody have a right to be here? Yes. I don't know. The members of the Glenbrook Preservation Association also have property rights and easement rights at Glenbrook Lake Tahoe, and in that conjunction have further standing. Okay. Was that ever set out any place in the record? Yes, and it's also spelled out in our brief. Okay, fine. I'd missed it. And our second amended complaint goes in much more depth in that regard. Okay, we allege the TRPA's noncompliance with its enforcement rule, its basic rules on the compact violations of environmental requirements, and providing preferential treatment. During this time, we proceeded to file discovery matters and notice depositions. Judge Hunt had a hearing on it. He said that we were entitled to do discovery. We went back to the trial court, and the magistrate, the magistrate judge, acknowledged that we had a right to discovery, but that kept periodically being postponed by motions or other matters brought before the court by the intervenors. The intervenors are a group concerning Mr. Ruvo and his group of interests at Lake Tahoe. These are persons who are recognized as being powerful and influential persons. One is the leading wholesale liquor supplier in the state of Nevada. The other is considered the number one lobbyist in the state of Nevada. Another one, at the time the suit was brought, was a leading hotel manager and owner. And we tried to take depositions because we had alleged that up in the Hamlet Meadow area, the intervenors were planning a complex entertainment facility, a commercial entertainment facility. And we also were starting to see things happen, that we felt that they were proceeding to pursue their plans without going to TRPA's board or through the normal permit process. They had applied for a peer permit, and we alleged that the peer was part of this entire complex. TRPA, we claim, knew about it, and they should have looked at the cumulative impacts of the related projects. TRPA kept telling the court that this was a speculative subject, that it was not ripe, and the court even referred to our comments on the Hamlet Meadow area as attorney puffing. As this case proceeded, we got some motions for summary judgment. The project had been half filled out without notice. Excuse me. Excuse me for interrupting, but what exactly is the remedy that you're seeking? Well, we were seeking at that time to have an environmental impact report provided on behalf of the cumulative impacts of these projects. We were also seeking to enjoin the intervenors, and we were seeking declaratory relief that TRPA was not doing their job and that they were giving preferential treatment, they were not doing cumulative. Well, that's not relief. An environmental impact statement under what law? Under the compact of the TRPA. The TRPA is not a Federal agency, but in 1980, after the courts had held that they were not subject to these environmental requirements, a compact imposed language and environmental requirements similar to the National Environmental Policy Act. The cases say we use the same language. The court decisions that have led to that language are presumed to be applicable unless there's some reason not, and that's why you cannot do incremental projects like, excuse me. Who's supposed to do it? The planning agency is supposed to conduct it? Who conducts the? Well, first of all, the TRPA would have to, under the compact, declare that an environmental impact statement has to be prepared. It can be prepared by TRPA. It's usually prepared by the governmental agency. Some areas they allow the proponent to prepare the environmental statement, but here I presume that the TRPA would be preparing the full environmental. You were asking the TRPA to prepare an environmental impact statement? Yes. That was one of our requests. That was. Are you still asking that? Yes. Okay. And is that in part for that? And part is to cover a development that hasn't occurred yet, and nobody knows if it's ever going to occur. Is that right? That's the big question here, because having been denied discovery, we could not get the evidence that we observed. Well, you can go walk the ground. Somebody can testify to what they say. The court, the TRPA convinced the court that this was puffery. If this case went back, we'd be able to show that there are additional plans. We'd be able to show photographs because the project has proceeded even further. But if all you can say is they're doing something, that wasn't satisfactory to the court. I'm not saying it should have been, but we should have been allowed to get the documents. The TRPA, in preparing the administrative record regarding the pier, did not put in any of the documents in their possession related to the Hamlet Meadows area. That's the area where our clients have easement rights and property rights. Their access was being blocked by these projects. We were not able to get TRPA to put the documents that they had in their possession. On the eve of the summary judgment, the hearing just before that, it came out that TRPA staff had permitted what is called the King-Lear House, which is a massive three-story facility that's part of this entire plan, and they did it without any notice to us or any notice to the Board of Governors of the TRPA. At the beginning of the case, when we filed a notice for preliminary injunction, the Federal trial court judge signed a stipulated court order requiring TRPA, if they were going to allow anything or anything was happening or permits, they had to give us notice so we could go to court to enjoin them. We never got any notice of that type. We never completed the preliminary injunction aspect. In fact, Judge Hunt, when he first granted us discovery, said it would take place after the initial depositions. So we are also challenging the utilization of this commercial entertainment complex in a way that is contrary to TRPA rules. TRPA, in their opening brief, page 25, acknowledges that the alleged intervenors' commercial entertainment project could never be approved by TRPA because it would violate numerous ordinances and TRPA's compact. Well, that's just, if that's true, and I certainly agree it's true, how do they allow us to get this far with no opportunity to discover, no opportunity to say you can't do this, you can't put barbed wire fences across our easements, you can't put in a rodeo sponsored by casinos in Nevada down here and not even water the dirt. The parking is in the wetlands area. We put in pictures of some of these things. But the case just continued that this is speculative, this is just a plan, and anything that we're saying is lawyer puffing. And so I just say that TRPA was not doing their duty. They were not doing what the State of Nevada, the State of California expected. Congress, when they approved this compact, the protection and enhancement of the environment at Lake Tahoe is what this case is about and what those documents are about. Who appoints TRPA? TRPA is appointed by the governor of each state, the president of the United States, and various other agencies present their nominees. I guess I'm still a little puzzled by the remedy to the Federal Court. This is quintessentially kind of a political. One of the remedies we are seeking is, okay, TRPA, if they're saying this is a family compound, make sure it is because it's being done in a different way and prohibit their use from presenting a commercial entertainment facility. That's an unlawful use, and that's part of the remedies we're seeking. It has to do with the utilization of that property. I can't go into things that are happening now unless the Court wanted an offer of proof, but that's the type of remedies that we're seeking. There's remedies as to whether this facility can be used in the way that it has been designed, and there's also issues of whether parts of these facilities were unlawfully built and that TRPA is the remedy body. It's their enforcement unit that decides what happens if a building is unlawfully constructed. It's not the court at this stage. It can come back through the court system, but we believe that we're entitled to a declaration that TRPA was out of line, that the interveners were out of line, that there should have been an environmental impact study. There should be no allowing of a commercial entertainment facility, whether that's by limiting its use or some other enforcement aspect. And that's what this case is about from the standpoint of the Glenbrook Preservation. I would like to reserve two minutes for rebuttal. You've used just about all of everybody's time. I did. May it please the Court, counsel, and the parties that are here. I'm Mark Gunderson. I represent the Glenbrook Homeowners Association, who has participated in this case as an interested party. This case involves the community of Glenbrook, Nevada. It's a development on the eastern shore of Lake Tahoe, lying within the state of Nevada of approximately 721 acres. This property was developed over a number of years, starting in 1997, and was completed in 1993. This was a planned unit development of approximately three phases. And there's no question in this particular case that this is a development that has a number of integrated portions to it, including general forest lands, easement areas, recreational areas, and the like. Approximately 525 acres of the 700 and somewhat acres were set aside for the use and the benefit of all other residents of Glenbrook. That set aside for all of the uses of the people who live in Glenbrook extended not only to the members which eventually became the Glenbrook Homeowners Association, but it also extended to other residents within the community of Glenbrook. This case involves the construction of a pier. The Ruvo defendants wished to build a pier approximately 400 feet from the existing community pier in which all the residents of the community of Glenbrook have a right to use for their own personal uses. We believe that to be improper, and we believe that there are three bases upon which the court should and could have found that that development was impermissible. One, that the Nevada planned unit development statutes prevent the development of a pier. I alluded to earlier that the parties agreed that the developer had completed its plan of development as of 1993. At that time, any further development of any of the properties within Glenbrook it had subject control of, including the easement areas in front of the Ruvo parcels, is prohibited. The Ruvo defendants... Can't they develop, I mean, can't they put up a recreational use pier? I don't believe so, and I'll tell you, it's interesting how you take a look at this. The Ruvo defendants aren't the developer. The developer that was designated in the plan of development was Glenbrook Company, or should more properly, I think we just don't get confused on names, Glenbrook Properties was the developer, not any of the individual purchasers who bought property. That developer concluded its subdivision, concluded what it was going to do, sold all of its remaining parcels to various third parties, and is no longer in the business of developing. The plan of development is complete. It's complete as it stands today. There's no more development to be done. The Ruvo defendants don't stand in the shoes of the developer because they're not designated in the plan of development as the developer. If you look at 278A, it clearly states that the, and they use the term landowner rather than developer, but the developer is the one who has all of these properties that it intends to develop as a single integrated unit of one or more parts to develop that property. That's not who these people are. They don't stand in those shoes because the logic of that conclusion is every homeowner who owns a lot then would have some rights of development, which is clearly an absurd result. So these defendants don't stand in the shoes of the developer. They don't have that right to continue to develop, and this is not another community peer. If they had the right to develop this peer under that guise, they would have to do so for the use and the benefit of all the homeowners. Now, they ---- But what is the status of the peer approval? The peer approval is no longer going forward because the TRPA stated in their conditions of approval that the Ruvo defendants needed to come to a court of competent jurisdiction and prove they did not have the rights of use of the community peer. That's what this case is about. That's what this case is about. At the end of the day, that's what this case is about. And that involved reading some documents? Yes. So we have ---- I'll move on from the peer development issues. The Ruvo defendants have the right to use a community peer. The Ruvo defendants have always had the right to use a community peer, as has everybody in the entire community of Glenbrook. And there are a number of bases from which you can derive that right of use. One, the recreational easements. If you look at the plan of development, it clearly provides that all the people, all the parties, all the interests who purchased property from the owner, Bliss, the Glenbrook company, had the right to use all the recreational lands at Glenbrook. Where did this report go wrong? In my view, it went wrong in one aspect and it went right in the other aspect. One, it went wrong in determining that the plan of development allowed this defendant to do what it had plans to do. That's where I believe the error occurred. It was correct when the Court concluded that these Ruvo defendants have the right of use of the community peer. So we have agreed with the Court on one hand and we have disagreed with the Court on the other basis. I suppose it's the agency that you disagree with in the first instance, isn't it? I think that the agency's decision in that limited regard, it's looking at its own regulations and applying those regulations. We've also asked for declaratory relief in this particular case and asked for injunctive relief to prevent this from going forward because it was anonymical to and adverse with the terms of the plan of development. The agency does not get into those land planning issues in that sense. They looked at it and simply said, does it meet the multi-peer designation, the multi-peer use designations, yes or no, and essentially bucked this off to the district court. Because I understand the only thing the Court's deciding is whether they have access to the community. That was the narrow issue that the Court hung its hat on and we believe the Court was correct when it concluded that the Ruvo defendants had the right of use of the community peer. Those have two bases where you can find that right, one in the recreational easements, the grants and reservations of the recreational easements, as well as the particular deeds that are involved here. Well, the question I guess is whether that, whether any easement attends the property of the Ruvo parties. Is that, I mean? There's no question that the Ruvo defendant's property is burdened by a recreational easement. There's no question. It's burdened by a recreational easement. Yes. But you're saying that how do you turn that burden into a right to use the peer that's already there? Two issues arise when that issue comes up. One, and we've briefed this and I don't want to burden the Court with this argument to go too far. But what happened is this was an issue that was really raised first time on appeal. We don't believe that was a proper issue to raise and it shouldn't have been raised and I don't believe ought to have been raised. Two, we addressed it in any event and simply agree with the Court when it concluded that the Ruvo defendants had the right to recreate on all of the recreational property within Glenbrook. That right's never been disputed. And if you actually take a look, if we had developed this argument more before the case, we certainly could have done so. You can take a look in the record and this is at page 931. There's yet again another deed in May of 78 that addresses this same issue. The developer and the owner agreed that everybody who purchased property within Glenbrook would have the right to use all the recreational property. Does that apply only to the A list, the Exhibit A list in the deed? Well, you've got a very interesting issue that comes up here. And this wasn't fully developed before the lower court because it was an issue that was raised. It was only raised on appeal. We haven't had a chance to develop that record before the district court. If you talk about the Exhibit A property, the Exhibit B property and the Exhibit C property, by itself, in a vacuum, you can create all kinds of machinations, but you've got to take a look at what happened in this plan of development. And much like in the May 1978 deed, there's language in this deed where the owner of the property grants to the developer other properties which actually overlap with the A, B and C properties in Exhibit 77, in which the developer and the owner agree that everybody has a right to use these properties. I don't think that's really an issue that we have. Kagan, you've more than used both of your time. I understand. I appreciate the Court's indulgence. We'll leave it there. Thank you. We'll give you some time to respond if the Court has any questions. Thank you. Good morning, Your Honor. My name is John Marshall, and I represent the Tahoe Regional Planning Agency. I'm here to respond to Mr. Zunbrun's arguments regarding the environmental documentation compliance. And Mr. Reed will respond to the state law issues regarding the conditions N and O that TRPA placed on the permit. I think the place to start is what is the project that is before the Court? And it's a private pier, a permit for a private pier that serves as an accessory structure to five residential parcels. That is what TRPA granted to the applicants in this case, limited to residential use. It's also a single-use design but for the addition of a second boat lift. So it's designed, the standards that the permit was issued for the pier is for a standard single-use pier with an additional boat lift. TRPA then analyzed all the environmental impacts associated with granting of that permit under Article 7 of the TRPA or the Tahoe Regional Planning Compact. There is no evidence in the record of any unanalyzed environmental impacts that TRPA did not consider. TRPA then placed conditions on the permit that mitigated all the significant impacts that were found. Primarily these were fisheries and scenic impacts. And then concluded that the issuance of the permit would not have a significant effect on the environment or made a fonzie. With respect to the issuance of the permit? Yes. So the only question from our perspective before the court is whether or not the fonzie, the finding of no significant effect, was supported by substantial evidence in the record. That's the only question that remains on this appeal. The second point is going to look at the Glenbrook Preservation Association's attack on that fonzie determination. Essentially they make four claims. The first one and the second one were raised below, and that's the connected and cumulative impacts tests. I think we clearly said on our briefs that the granting of a pier is not connected to any hypothetical upland development that these plaintiffs are afraid that might occur. It doesn't automatically be triggered by that development. It can proceed independent of the development, and there's no justification. There's an independent justification for that pier, i.e., these people want to have access to the lake independent of any other access that they might have. And more importantly, TRPA conditioned the pier permit so that if they have access someplace else, i.e., the community pier, then they don't get the pier. In other words, the justification is if you have access, you don't get the pier. If you don't have access, then there is a justification for the pier. The next issue they attack is the cumulative impacts. And I think, Judge Canby, you raised the point of what they're requesting us to do is to speculate about a commercial development, upland, and somehow that we need to take into account that hypothetical commercial development. There are multiple problems with this argument. The first one being is we have no idea exactly what they mean when they say a commercial development. Secondly, they have not alleged any impacts, adverse environmental impacts associated with the commercial upland development. And lastly, when you aggregate impacts under the cumulative impacts test, you need to aggregate the impacts of the pier, some perhaps small impact that might aggregate with large impacts, like the typical NEPA case that I think the Ninth Circuit deals with is like traffic or air quality or impacts that are small for this one particular project, but when you aggregate them with past, present, and future projects, they become significant. The impacts associated with the pier, fisheries, scenic, were the main issues that we dealt with. There are no impacts that they have alleged to those resources from any upland development, so there's nothing to aggregate, regardless of how hypothetical this project is. The next two issues they talk about are controversy and whether the initial environmental checklist is consistent with Article 7 of the Compact. Both those issues were not raised below, and we feel that they are waived, and therefore are waived and should not be addressed here. Nevertheless, we address them in our brief, and just briefly, there is no controversy over impacts, which is if you analogized the NEPA regulations, the CEQ issues. The controversy has to center on something that has to do with impacts, not the use, not controversy over the use. It's not controversy over whether or not there will be a commercial facility that these Glenbrook residents may not want to be there, but is there controversy over the environmental impacts associated with that? In this case, there is no evidence in the record, they submitted no evidence that there is controversy over TRPA's conclusion that there will be no significant effect associated with the granting of the pier. Lastly, regarding the consistency of the environmental checklist that TRPA used in part to make its FONSI determination with Article 7, this also was not raised below, and we do not feel it's appropriate, but nevertheless, the statute, the Compact itself in Article 7, all that it says is when TRPA acts on projects with significant environmental effects, you shall do an environmental impact statement. It's completely silent as to how you make that determination. TRPA adopted regulations consistent with that mandate in the statute that if there is or if there may be a significant effect, then you do an EIS. So we have a three-step process that we go through, checklist, environmental assessment, and EIS. That is a rational interpretation of the Compact, and therefore, under Chevron, it is legitimate. Now, I would just like to inform the Court that Mr. Zumbrun and I finished litigating a case in the district court that we cite to in the briefs, and the Court just issued a published opinion on this issue, and that can be found at 365 F-subsecond 1146, and the discussion is at 1157 where the Court finds that this IEC process is a legitimate way to implement the Compact. What's the name of the case? It's the Committee for the Reasonable Regulation of Lake Tahoe v. TRPA. It had to do with adoption of some scenic thresholds. What is the status of this big development casino deal? Well... It would be sort of the presence, an offstage presence. Yes, I agree with that. That's the, I think, for not to denigrate their interest too much, but they're concerned about what's happening in the uplands. Rest assured that any development that occurs there is reviewed by TRPA if it meets the minimum triggers, and that any development will be analyzed for its environmental impacts that will occur there. Right now, actually, there's an application in the record for relocation of development in the uplands, and that was the only application that was before TRPA, and I think that's at the excerpts of record, Volume 5, 1047. And what that just shows is there's a, in TRPA's regulations, you can essentially, you can reconfigure existing development, but it has to remain residential. If they want to come in for something else, a commercial entertainment facility, they have to come to us. All I wanted to know was, is there any application for a commercial facility that's been filed or pending? No. Okay. The last issue I'd like to address very briefly is this issue of discovery and the dispositive nature that they raise in their reply brief of the protective order. They argue that the magistrate could not have precluded discovery in an administrative record case, which is a common occurrence, because it was dispositive of their claims. This issue was not raised to the district court under 72A. It was not briefed in their opening brief, and in any event, it's not accurate. It was not dispositive of their claims. It just simply limited their claims to the administrative record, and that, we feel, is perfectly justifiable. So therefore, we urge this court to affirm the district court's ruling. Thank you. Thank you. Mr. Reed? Good morning. Just to start off on, yes, Leif Reed, I represent the applicants for the peer called the interveners in the pleadings. Condition O, just so that's clear, we're here because of Condition O, and I think that the condition itself needs to be stated clearly. It exists in the permit because of TRPA Code Section 54-8A, which prohibits new peers on parcels that, and this is the important point, it prohibits new peers on individual shoreline lots that are served by existing multiple-use facilities. The TRPA board's findings say that the determination has to focus on the parcels because that's what's required under the code. This, when it is stated by GAHOA that the focus is on individual rights, whether Mr. Fine has access to the parcel or Mr. Ruvo, that isn't what's dictated under the code. That isn't what the board's finding focuses on, and we believe that the court should defer to the manner in which TRPA has interpreted that condition. We're here to talk about access. That's what Condition O is about. And I am at a loss to explain to you how the district court, how or why the district court did what it did on that issue, and that's because there's no evidence that supports the district court's determination on access, none. And it stands out to me for that reason, because the order is otherwise well-reasoned, thorough, and correct. But there is no way that the fine parcels were conveyed to Glenbrook Properties in 1977 and they never benefited from that easement. That's the question that a judge can be asked. How does that burden become a benefit? It can't. I can explain to you why. The first reason, and it's just not possible, the first reason are the GAHOA CC&Rs. The legal description of the property that was conveyed to Glenbrook Properties in 1977, that's the Exhibit A property in the April 1977 deed, that legal description is identical to the legal description of the property that was annexed into the GAHOA CC&Rs. This is the later Parcel 1. Parcel 1. For purposes of the development district. Exactly. That is shown on this map. And all those three descriptions were the same, is that what you're saying? They are. In the original deed, the description of the property granted and later the property subject to the CC&Rs and the property that went into Parcel 1 are all the same legal description? Exactly. And that's page 160 of our supplemental excerpt, page 576 of our supplemental excerpt. Those are the two legal descriptions. They are the same. So it's just not possible. If the fine parcels were never annexed into the CC&Rs, they couldn't have been part of that 1977 transaction to Glenbrook Properties. And another proof of that is at page 394 of our supplemental excerpt, and that is a deed which shows that those parcels, the fine parcels, specifically this is one deed. And this is Parcel A. That's the parcel where the pier has been approved to be built. That parcel remained under the ownership of Glenbrook Company for ten more years following April 1977. It was sold to Mr. Fine in June. It was sold to Glenbrook Properties in June of 1987 and then sold to Mr. Fine a few weeks after that. Now, are those going to be answers in the record? They are. Page 394 of our supplemental excerpt. And we made the Court below aware of those. Two other things that I want to tell you just to close the loop on that Exhibit A issue. There are two survey maps in the record that show that the fine parcels weren't part of that transaction. The first you see in front of you, that demonstrative exhibit, comes from page 221 of the record. The property that is described in Exhibit A and that was conveyed to Glenbrook Properties at that time is in green. The easement property you see in the exhibit there is in yellow. And the fine parcels are in pink. The fine parcels were burdened by the easement. That's what you see, the pink and yellow. That's the area where the property is burdened by the easement. But obviously, the fine parcels couldn't be two places at once. And that is the last reason why the District Court got the access issue wrong. The merger doctrine. The fine parcels couldn't have been both part of the property that was conveyed and benefited with the easement and in the property that was retained. I'm not sure I understand the rest of your argument about the not being part of the parcels that were in the CCRs and everything. But I would think that somebody could grant a deed saying, I grant lots A, B, and C and also say I burden lots A, B, and C with an easement. There might be a merger for a third of that, but it would give an easement to each lot over the other lots. And it seems to me you can have a lot that's both the subject of a conveyance and the subject of a burden. I think that I agree with you that that is theoretically possible, but that certainly does not, it's not supported in the facts here. Your argument is that you were never in the Exhibit A to the original deed, I gather. And we couldn't have been for the reasons you see that map in front of you, the legal descriptions that are in the CCRs, which are identical to the legal description of the property that was conveyed and benefited with the easement, and the fact that those parcels were owned for ten more years by Glenbrook Company. They weren't conveyed to Glenbrook Properties for ten years. On the, to clarify on the issue of whether this was raised or not, I think that is important. Page 381 of the record, here's what we said to the district court. I'm quoting. The fine parcels were not described in Exhibit A to the 1977 deed and were not transferred to Glenbrook Properties at that time. I think there's no reading of that language that you could say that we didn't make the district court aware of that issue. And the simple fact is that both parties made the court aware of that issue. This map is in the record. This map is in the record because GAHOA submitted it in support of its assertion on summary judgment that the fine parcels were burdened by the recreational easement and described in Exhibit C to the April 1977 deed. That's why that map's in the record. Second map, just briefly. It's not just two survey maps in the record that establish that point. There's also the map that was issued by the court in 1990, the Nevada State Court, in the Glenbrook Homeowners Association's case against Glenbrook Company. That map, again, shows the Exhibit A property that was conveyed, and it shows the fine parcels in pink separate and apart from that property that was conveyed. It's just not possible that it was part of that April 1977 conveyance. That map is found at page 239 in the record, and the only difference you see in that map is that we have rotated it 90 degrees so it's easier to read, so the north-south planes are the same in both documents. On the issue of who holds the rights, we are the successors in interest to the party of the first part in the deed. I think that was when Mr. Gunderson was talking about the development being complete, that there can be no further development once it is declared complete. That's an argument that has no basis in NRS 278A or in the easement itself. And you can't just say that. There has to be some support there. The parties are governed by the easement. That's what, in any dispute over an easement, what has to be referred to. And specifically, we are bound by the covenants in that easement. GAHOA is a successor to the second party of the second part in that deed. We are bound to allow GAHOA members access to our parcels for the uses that are set out in that deed. Also, GAHOA is bound by the covenants in that deed that allow development by the owners of the property, not all types of development, but only development of recreational uses as approved by the TRPA. And any concern about that being, that development overburdening or any use of that easement, I think falls by the wayside given the language in the TRPA's approval, which precludes any other development in the shore zone. There's a deed restriction there. And I think on the issue of NRS 278A, all of the arguments you heard raised have already been raised to the Nevada Supreme Court and addressed in its opinion issued in 1995. The questions about density, intensity of use were found at that time. Page 901p2, it's page 136 of that opinion. The district, pardon me, the Nevada Supreme Court said at that time that density and intensity, those types of concerns weren't enforceable elements of the Glenbrook Plan under NRS 278A, and that's because they are not supported by covenant language in the documents, the recorded documents that bind the parties. I know I've gone over my time. If I could ask just one more moment on this issue of the May 1978 deed that was raised at oral argument, not addressed in our briefs. That is, I think, very misleading. As you look at that deed, it relates to a completely separate conveyance of property and has nothing to do with this dispute at all. Thank you. You wish to respond briefly? No. Yeah. Well, who's going to respond on the question of access? All right. Very briefly. I will. The Glenbrook community pier is on property that is not these intervener defendants. These intervener defendants own property in Glenbrook. They have the rights to use the recreational easement. The right to use that recreational easement includes the right to use the pier. The court was correct. Number two, there are specific deeds in this record that clearly allow the right of use of these defendants to use the community pier. The court was correct. Thank you. Thank you. Are there any questions? I'm sorry. I think you have more than used your time. Do you want a minute? All right. I want to bring the Court's attention to the fact that the pier that we're talking about now was proposed on December 5th and was approved on December 19th of 2001. That's an amazing amount of time, and it questions the environmental issues. The impacts, the environmental impacts are found on page 7 of our Second Amendment complaint, paragraph 18. They go in tremendous detail, and they cover the points that have been made. The discovery in an administrative case, there can be discovery where it's alleged that TRPA has not done everything, because how do you know what they haven't done or if there's been bad faith? And the administrative cause of action that we filed was our eighth, challenging this process. And thank you. Thank you. You used your one-minute. Well, the case just argued, matters just argued are submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned. All rise. This Court for this session stands adjourned. This Court for this session stands adjourned.
judges: Schroeder, Canby, Duffy